UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

PLANNED PARENTHOOD OF
GREATER TEXAS SURGICAL
HEALTH SERVICES, on behalf of itself,
its staff, physicians, and patients, et al.,

      Plaintiffs,

v.                                                                      No. 5:21-CV-114-H

CITY OF LUBBOCK, TEXAS,

      Defendant.

## ORDER DISMISSING CASE FOR LACK OF JURISDICTION

The genesis of this dispute is a City of Lubbock ordinance declaring the city a "sanctuary city for the unborn." The ordinance includes a private-enforcement section allowing certain family members and citizens to sue abortion providers or those who aid or abet abortions. Citizen-suit enforcement may not be brought by the city, and anyone sued may assert cases like *Roe v. Wade* as a defense to liability. Instead of waiting to be sued and challenging the ordinance in response, plaintiffs sued Lubbock to "enjoin the city from maintaining in force, enforcing, or giving legal effect to the ordinance" and to declare it invalid. Plaintiffs allege the ordinance is invalid because it violates federal constitutional rights, could not validly create civil liability between private parties, and is preempted by state law. But plaintiffs admit that even if the Court gave them everything they wanted, the Court's ruling would not bar private citizens from bringing suit in state court, bind the state judiciary by its ruling, or force the ordinance's repeal. Because the ability to remedy a plaintiff's injury through a favorable decision is a prerequisite to a plaintiff's standing to sue—an ability absent here—the Court dismisses the case for lack of jurisdiction.

The requirements of standing are long-established and must be present in every case, regardless of the suit's subject matter. The U.S. Constitution and binding precedent make clear that federal courts do not exist to render advisory opinions on a law's validity. Rather, this Court is limited to resolving actual cases and controversies. To invoke this Court's authority, plaintiffs have the burden to show an injury that is fairly traceable to the city's conduct and likely to be redressed by a favorable decision. Because plaintiffs fail to show that any relief provided by this Court is likely to redress the injury at issue—citizen suits brought in state court—the Court lacks jurisdiction.

Fifth Circuit precedent compels this result. Twenty years ago, the Fifth Circuit heard a similar dispute involving a Louisiana law that allowed private parties to sue abortion providers for damages, and the en banc court dismissed the case because the plaintiffs lacked standing. *Okpalobi v. Foster*, 244 F.3d 405, 429 (5th Cir. 2001) (en banc); *id.* at 429–32 (Higginbotham, J., concurring). The court "[did] not challenge that the plaintiffs [were] suffering a threatened injury." Instead, in addition to a lack of causation, the court relied on the fact that the plaintiffs' "injury [could not] be redressed by these defendants—that is, these defendants [could not] prevent purely private litigants from filing and prosecuting a cause of action under Act 825 and [could not] prevent the courts of Louisiana from processing and hearing these private tort cases." *Id.*

The Fifth Circuit reaffirmed this holding twelve years later in *K.P. v. LeBlanc* (*LeBlanc II*), 729 F.3d 427 (5th Cir. 2013), where abortion providers challenged the constitutionality of the same private-enforcement provision in a lawsuit against board members of a medical-malpractice patient fund that excluded participation with respect to abortion-related procedures. *Id.* at 433. Citing *Okpalobi*, the Court held that "it is the private plaintiff,

bringing a private lawsuit under Act 825, who causes the injury of which the plaintiffs complain," and because "enjoining the [b]oard [p]arties from 'enforcing' the cause of action would not address their role in administering the [f]und[,] . . . declaratory and injunctive relief directed at the [b]oard [defendants] would not redress the [p]roviders' injury." *Id.* at 437 (citing *Okpalobi*, 244 F.3d at 431–32 (Higginbotham, J., concurring)).

In contrast with *Okpalobi* and *LeBlanc*, the Fifth Circuit found standing was present in *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 159 (5th Cir. 2007), and plaintiffs claim this is the controlling case here.  But the state waived Eleventh Amendment immunity in *Allstate*, subjecting it to an injunction against enforcing the statute at issue.  Because the court considered the state itself, and not just a state officer, to be the real defendant, any declaratory or injunctive relief awarded in *Allstate* bound the entire state, which necessarily included the state courts.  The same is not true here because even though the city also does not have governmental immunity,[1] it does not and cannot control the state courts that will hear the private-enforcement lawsuits.  And the plaintiffs' assertion that the city's lack of governmental immunity gives them standing to challenge the ordinance is undermined by the fact that the defendants in *LeBlanc II* did not have immunity, yet the Fifth Circuit found that standing was not present.

Finally, even assuming the Court had jurisdiction, it would abstain under the *Pullman* doctrine to permit the state courts to first resolve an important and unsettled question of state law before resolving the federal constitutional issues.  The federal

---

[1] In a recent concurrence, Judge Oldham noted the imprecise language often used when discussing sovereign immunity.  *Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 495 n.2 (5th Cir. 2020).  Here, as in *Green Valley*, the Court will use "Eleventh Amendment immunity" when referencing the immunity recognized in the amendment's text, the term "state sovereign immunity" when referencing a state's "broader constitutional immunity that predated the ratification of the Eleventh Amendment," and the term "governmental immunity" when referring to the city.  *See id.*

constitutional claim in this case necessarily depends on the validity of the city ordinance.

And it is currently unclear under state law whether the private-enforcement mechanism in

the ordinance was enacted ultra vires.  Although the Texas Solicitor General believes that

the plaintiffs' challenge to the city's ability to create the private cause of action will

ultimately fail, he recognizes that relevant case law provides "both sides in this case [with]

respectable arguments to make about the scope of a city's authority to expand tort liability."

Dkt. No. 47 at 2–4.  Thus, the elements for *Pullman* abstention are met in this case.

Moreover, the totality of the circumstances weighs in favor of abstention, especially given

that the issue involves an important and uniquely state-based decision regarding the balance

of power between state and local governments.  And finally, although there is no pending

state proceeding on this matter, "the probability that any federal adjudication [in this case]

would be effectively advisory is so great that this concern alone is sufficient to justify

abstention."  *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n.9 (1987) (citing *R.R. Comm'n of Tex.

v. Pullman Co.*, 312 U.S. 496 (1941)).

## 1.     Factual Background

### A.     Enactment of the ordinance

In September 2020, a committee of Lubbock residents filed a petition proposing

"[a]n ordinance outlawing abortion within the City of Lubbock, declaring Lubbock a

sanctuary city for the unborn."  Dkt. No. 14 at 94.[2]  The petition proposed that the

ordinance "be submitted to the city council to either pass and adopt the proposed initiative

or to call a special election in accordance with the election code."  *Id.*  More than 25 percent

---

[2] Throughout this order, when referring to the record, the Court cites to the ECF page numbers.

of the qualified voters within the city—as determined by the number voting at the last regular municipal election—signed the petition.  *See id.* at 147, 159.

The city retained outside counsel to analyze whether the proposed ordinance would be valid if passed.  *Id.* at 110, 112–28.  In a memorandum addressed to the Lubbock City Attorney, outside counsel opined that "[t]he [p]roposed [o]rdinance is inconsistent with the United States and Texas Constitutions," and "both the criminal and civil provisions of the [p]roposed [o]rdinance are inconsistent with the present law of the State of Texas" and, therefore, preempted by state law and ineffective.  *Id.* at 128.  After receiving this memorandum, the city announced that a petition to consider the ordinance had been submitted to the city council and released a statement indicating that the proposed ordinance was contrary to Texas Law.  *Id.* at 110.

Because the petition had enough verified signatures to force a vote by the city council on whether to adopt the ordinance, the city council held a meeting in November 2020.  *Id.* at 110, 132.  At the meeting, the city council voted unanimously to reject the ordinance.  *Id.* at 110, 130.

Despite this rejection, the city's charter allows for voter-proposed ordinances to be put up for a city-wide vote.  *Id.* at 159.  Within 20 days of the city council's vote, the citizens supporting the petition filed a request to put the ordinance on the ballot for a vote.  *Id.* at 130–43, 145, 159.  On May 1, 2021, the voters passed the ordinance with 62% of votes in favor of the ordinance.  *Id.* at 109.  The ordinance became effective on June 1, 2021—the same day the Court issues this order.  Dkt. No. 14-1 at 81.

### B.     The Ordinance

#### i.     The Findings

The ordinance begins by making various findings.  First, the ordinance finds that "the State of Texas has never repealed its pre-*Roe v. Wade* statutes that outlaw and criminalize abortion unless the mother's life is in danger" but, instead, it re-codified and transferred those criminal provisions.  Dkt. No. 14 at 32.  Therefore, Texas law "continues to define abortion as a criminal offense except when necessary to save the life of the mother."  *Id.*  Dkt. No. 14 at 32.  The Texas legislature's recently passed Texas Heartbeat Act is consistent with these findings, stating that "[t]he legislature finds that the State of Texas never repealed, either expressly or by implication, the state statutes enacted before the ruling in *Roe v. Wade*, 410 U.S. 113 (1973), that prohibit and criminalize abortion unless the mother's life is in danger."  Texas Heartbeat Act, 87th Leg., R.S., S.B. 8, § 2 (effective Sept. 1, 2021).

The ordinance further finds that even though *Roe* and subsequent United States Supreme Court cases may limit the ability of state officials to impose penalties for violations of Texas abortion statutes, those cases do not veto, cancel, formally revoke, or erase the statutes, which continue to exist as the law of Texas until repealed by the Texas legislature. Dkt. No. 14 at 32–33.  Thus, abortion is still a criminal act under Texas law.  *Id.* (citing *Pidgeon v. Turner*, 538 S.W.3d 73, 88 n.21 (Tex. 2017) ("When a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it . . . .") and *Texas. v. United States*, 945 F.3d 355, 396 (5th Cir. 2019), *cert. granted sub nom. California v. Texas*, 140 S. Ct. 1262 (U.S. Mar. 2, 2020) (No. 19-840) (citing Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 936 (2018))).

Finally, "[t]o protect the health and welfare of all residents within the City of Lubbock, including the unborn," the ordinance finds that it is necessary to outlaw abortion by supplementing the "existing state-law prohibitions on abortion-murder with its own prohibitions on abortion, and to empower city officials and private citizens to enforce these prohibitions to the maximum extent permitted by state law and the Constitution." Dkt. No. 14 at 33. Although not yet effective, the Texas Heartbeat Act supports the city's ability to enact such an ordinance despite any other state law. The Act amends the Government Code to provide that "[another Texas] statute may not be construed to restrict a political subdivision from regulating or prohibiting abortion in a manner that is at least as stringent as the laws of this state." Texas Heartbeat Act, 87th Leg., R.S., S.B. 8, § 5 (effective Sept. 1, 2021).

### ii.    The Provisions

The ordinance declares that Lubbock, Texas, is "a Sanctuary city for the Unborn" and that "[a]bortion at all times and all stages of pregnancy is declared to be an act of murder." Dkt. No. 14 at 136. Accordingly, the ordinance declares that it is unlawful to procure or perform an abortion or to aid or abet an abortion within the city limits.[3] *Id.* at 136–37.

Additionally, the ordinance creates a public-enforcement mechanism that has not and will not go into effect until certain conditions are met. *Id.* at 137–38.[4] The public-

---

[3] The ordinance creates an exception to this general rule through an affirmative defense that arises if the abortion was in response to a life-threatening physical condition tied to pregnancy that places the woman in danger of death or substantial impairment of a bodily function unless an abortion is performed. *Id.* at 137.

[4] Although plaintiffs initially challenged the ordinance's public-enforcement provisions, they recognized during the May 28, 2021 hearing that this claim was not ripe for consideration. Thus, the Court considers this challenge withdrawn. Dkt. No. 48 at 64.

enforcement mechanism provides that any person who procures, performs, or aids or abets an abortion "shall be subject to the maximum penalty permitted under Texas law for violation of a municipal ordinance governing public health, and each violation shall constitute a separate offense." *Id.* at 137. But such a penalty cannot be imposed "if a previous decision of the Supreme Court of the United States established that the prohibited conduct was constitutionally protected at the time it occurred" and until one of three events occurs. *Id.* at 138. Those events include: (1) the Supreme Court overrules *Roe v. Wade* and *Planned Parenthood v. Casey*; (2) a state or federal court rules that such a penalty will not impose an "undue burden" on women seeking abortions; and (3) a state or federal court rules that the party that the penalty could be enforced against lacks third-party standing to assert the rights of women seeking abortions in court. *Id.*

The ordinance also creates a private-enforcement provision. *Id.* at 138–40. That provision allows an unborn child's mother, father, grandparents, siblings, and half siblings to sue any party other than the unborn child's mother that procures, performs, or aids and abets an abortion. *Id.* at 138. If they choose to sue, these individuals may recover compensatory damages, punitive damages, and costs and attorneys' fees. *Id.* at 138–39. The private-enforcement provision also allows any private citizen of Texas to bring an action for injunctive relief, statutory damages, and costs and attorneys' fees against any person, other than the unborn child's mother, that procures, performs, or aids and abets an abortion. *Id.* at 139. There is no statute of limitations for any lawsuit brought under the private-enforcement provision. *Id.* But the ordinance makes clear that the city and other state and local-government entities cannot bring private-enforcement actions. *Id.* And any party that has third-party standing to assert the rights of women seeking abortions in court

8

may assert *Roe v. Wade*, *Planned Parenthood v. Casey*, or any other abortion-related Supreme Court decisions as a defense to a private-enforcement action if the imposition of liability in that lawsuit would impose an "undue burden" on women seeking abortions.  *Id.* at 139–40.

Finally, the ordinance contains a severability provision.  *Id.* at 140–41.  That provision states that "every provision, section, subsection, sentence, clause, phrase, or word in th[e] ordinance, and every application of the provisions in th[e] ordinance are severable from each other."  *Id.* at 140.  Thus, "[a]ll constitutionally valid applications of th[e] ordinance shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the city council's intent and priority that the valid applications be allowed to stand alone."  *Id.*

### iii.   Enforcement

Although not expressly addressed in the ordinance, if the public-enforcement provision goes into effect, any associated cases will be brought and litigated in municipal courts.  Tex. Gov't Code § 29.003(a); Tex. Local Gov't Code § 54.001(a) & (b)(1).  In contrast, a party that brings a private-enforcement action under the ordinance cannot litigate that action in the city's municipal courts of record.

Section 30.00005(d) of the Texas Government Code allows the governing body of a municipality to provide that its municipal courts of record have civil jurisdiction over certain civil actions.  Specifically, the governing body of a municipality may grant municipal courts "concurrent jurisdiction with a district court or a county court at law under Subchapter B,

Chapter 54, Local Government Code, within the municipality's territorial limits . . . for the purpose of enforcing health and safety . . . ordinances."[5] § 30.00005(d)(2).

Subchapter B of Chapter 54 of the Texas Local Government Code allows municipalities to bring civil actions for the enforcement of an ordinance relating to the preservation of public health. Tex. Loc. Gov't Code § 54.012 ("A municipality may bring a civil action for the enforcement of an ordinance[] . . . relating to the preservation of public health . . . ."). But the subchapter does not allow parties other than municipalities to bring civil actions. And "[n]othing is to be added to what the text states or reasonably implies[;] . . . a matter not covered is to be treated as not covered." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (Thompson/West 2012). Thus, even though the city council has conferred jurisdiction on the city's municipal courts over actions brought under Subchapter B of Chapter 54 of the Texas Local Government Code, Lubbock, Tex., General ordinances ch. 1, art. I, § 1.07.001(b)(2) (2017), those courts do not have jurisdiction to hear private actions brought under the ordinance, which the city cannot bring itself. Dkt. No. 1-1 at 7.

### C.     The Plaintiffs

Planned Parenthood of Greater Texas Surgical Health Services and G. Sealy Massingill, M.D., are plaintiffs in this case. Dkt. No. 1. Dr. Massingill is the Chief Medical Officer of Planned Parenthood of Greater Texas, Planned Parenthood's parent corporation. *Id.* at 6. In that role, he oversees Planned Parenthood's medical offerings. *Id.* at 7. He also performs abortions. *Id.*

---

[5] This is not the only type of civil jurisdiction that the governing body of a municipality may grant to municipal courts of record, but the other types of civil jurisdiction are not applicable or relevant to this case because they pertain to enforcement actions pertaining to dangerous buildings and junked vehicles. *See* § 30.00005(d)(2).

In October 2020, Planned Parenthood opened a Lubbock location.  Dkt. No. 14 at 8.
On April 15, 2021, Planned Parenthood began performing abortions at its Lubbock center.
*Id.* at 9.  Dr. Massingill has performed abortions at the Planned Parenthood center in
Lubbock.  Dkt. No. 1 at 4.  He asserts that in its first three weeks of providing abortions in
Lubbock, Planned Parenthood performed 39 abortions.  *Id.* at 9.

## 2.   Procedural History

Planned Parenthood and Dr. Massingill filed a complaint against the city alleging
that (1) the ordinance violates the Due Process Clause of the Fourteenth Amendment to the
United States Constitution because it creates an undue burden on women seeking abortions;
(2) Texas law does not allow municipalities to create civil liability between private parties;
and (3) the Texas Penal Code and Texas wrongful-death statute preempt the ordinance.
Dkt. No. 1.  Plaintiffs request the Court to: (1) declare the ordinance unconstitutional;
(2) preliminarily and permanently enjoin the city and people associated with the city from
maintaining in force, enforcing, or giving legal effect to the ordinance; and (3) declare the
ordinance invalid under Texas law.  *Id.* at 14–15.

Simultaneous with the filing of their Complaint, plaintiffs filed an Emergency
Motion for Preliminary Injunction or Summary Judgment.  Dkt. Nos. 12–13.  In that
motion, plaintiffs request the Court to "preliminarily enjoin the city from maintaining in
force, enforcing, or giving legal effect to the ordinance, or grant summary judgment to
[p]laintiffs, declare the ordinance invalid, and permanently enjoin the city from maintaining
in force, enforcing, or giving legal effect to the ordinance."  Dkt. No. 13 at 31.

The day after plaintiffs filed their Complaint and motion, Senior District Judge Sam
R. Cummings, the judge originally assigned to this case, recused himself and directed the

Clerk of Court to reassign the case to the undersigned district judge.  Dkt. No. 17.  On the same day that the order of recusal was entered, the Court issued an order requiring the parties to file jurisdictional briefing to address whether the plaintiffs have standing to assert their claims against the city.  Dkt. No. 18.  The Court ordered simultaneous briefing and responses, along with the parties' positions on potential abstention under *Pullman.  Id.* at 2; Dkt. Nos. 31; 32; 38–40; 42; 44–45.  The Court also granted leave for amici to file a brief and for the parties to respond.  Dkt. Nos. 35–36; 38; 43.  Finally, because plaintiffs claim that the ordinance is preempted—and voided—by state law and that the city lacked authority to create the private-enforcement provision, the Court invited the Office of the Attorney General, through the Texas Solicitor General, to share its views of the relevant state law.  Dkt. No. 41.  On May 31, 2021, the Solicitor General filed a response to the Court's invitation.[6]  Dkt. No. 47.

**3.    Legal Standards**

**A.    Standing**

The U.S. Constitution speaks directly to the limits of the federal judiciary's authority. Article III, Section 2, of the United States Constitution states that "[t]he judicial Power shall extend to . . . cases . . . [and] to controversies."  Thus, the jurisdiction of federal courts is limited to "'[c]ases' and '[c]ontroversies.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).  "Courts are not legislatures with a free-ranging ability to correct mistakes—even our own. . . . That's why we start every case, as the court faithfully does here, by assuring ourselves of our own jurisdiction."  *Green Valley Special Util. Dist.*, 969 F.3d at 494 (Oldham,

---

[6] The Court thanks the Texas Solicitor General for accepting the Court's invitation and providing a candid and helpful letter brief—especially given that he drafted the letter on short notice over the Memorial Day weekend and holiday.

J., concurring).  *Lujan* explained the importance of this limitation: "[T]he Constitution's central mechanism of separation of powers depends largely upon the common understanding of what activities are appropriate to legislatures, to executives, and to courts."  504 U.S. at 559–60; *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (holding that "separation-of-powers principles underl[ie] th[e] [case-and-controversy] limitation").

The doctrine of standing is one of the landmarks that sets apart the "'[c]ases' and '[c]ontroversies' that are of the justiciable sort referred to in Article III—'serv[ing] to identify those disputes which are appropriately resolved through the judicial process.'"  *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  "Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Id.*  Thus, to invoke the judicial power and the jurisdiction of the federal courts, "a plaintiff must satisfy the . . . 'irreducible constitutional minimum' for standing."  *Cranor v. 5 Star Nutrition, L.L.C.*, ___ F.3d ___, No. 19-51173, 2021 WL 2133433, at *2 (5th Cir. May 26, 2021) (quoting *Lujan*, 504 U.S. at 560).

"[I]n all standing inquiries, the critical question is whether at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.'"  *Horne v. Flores*, 557 U.S. 433, 445 (2009) (emphasis in original).  "[T]he constitutional minimum of standing contains three elements."  *Lujan*, 504 U.S. at 560.  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  An injury

in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560 (internal quotations omitted).  To be "fairly traceable to the challenged action of the defendant," the injury must "not [be] the result of the independent action of some third party not before the court." *Id.* (internal quotations omitted).  Third, the redressability element will not be satisfied if it is "merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561.

"The party invoking federal jurisdiction bears the burden of establishing [the elements of standing]." *Id.*  A plaintiff must "support [each element of standing] in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.*  Therefore, a plaintiff must support each element of standing "with the manner and degree of evidence required at the successive stages of litigation." *Id.*  "Because a preliminary injunction 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief,' the plaintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction.'" *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

In the context of abortion regulations, there are many examples of courts analyzing a plaintiff's standing.  For example, in *Planned Parenthood of Greater Texas Surgical Health Services. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014), the Fifth Circuit held that abortion providers who faced potential administrative and criminal penalties for not complying with abortion statutes had standing to challenge the statutes by suing the Texas Attorney General and other individuals.  In *K.P. v. LeBlanc* (*LeBlanc I*), 627 F.3d 115, 119–20, 122–24 (5th Cir. 2010), the Fifth Circuit also held that physicians had standing to challenge a Louisiana

14

statute that created a medical-malpractice patient fund where the governing board denied

them the ability to participate in the fund with respect to abortion-related procedures.  In

contrast, in *Henderson v. Stalder*, 287 F.3d 374, 377–78, 381–82 (5th Cir. 2002), the Fifth

Circuit held that an abortion provider did not have standing to challenge a Louisiana statute

that prohibited dispersal of funds from a "choose life" license plate to abortion providers

because declaring the fund unconstitutional would not remedy the injury—the provider's

inability to receive grants from the fund.

### B.     Standing to Challenge Laws that Create Private-Enforcement Provisions

Fifth Circuit precedent makes clear that fidelity to Article III standing is particularly

important—and difficult to establish—when the plaintiff raises a pre-enforcement challenge

to laws that establish private-enforcement provisions.  And, critically for this Court's

determination of jurisdiction, the Fifth Circuit has addressed these principles in the abortion

context.  On at least two occasions, including speaking as an en banc court, the Fifth Circuit

held that a plaintiff lacked standing to challenge a state law creating a private cause of

action against an abortion provider.

First, the Fifth Circuit held that the plaintiffs lacked standing in *Okpalobi v. Foster*, 244

F.3d 405, 424–29 (5th Cir. 2001); *id.* at 429–32 (Higginbotham, J., concurring).  The case

involved Act 825, a Louisiana law that "provides to women who undergo an abortion a

private tort remedy against the doctors who perform the abortion."  *Id.* at 409.  Abortion

providers sued Louisiana's governor and attorney general to challenge the law's

constitutionality, arguing that it imposed an "undue burden" on a woman's right to obtain

an abortion and would force them to stop providing abortions.  *Id.* at 409–10.  The district

court granted the plaintiffs' request for a preliminary injunction, and a Fifth Circuit panel upheld it. *Id.* But the Fifth Circuit reheard the case en banc. *Id.* at 409.

Although seven of fourteen judges signed a plurality opinion that would have held Eleventh Amendment immunity barred suit, the en banc court held that the plaintiffs lacked standing to sue. *Id.* at 408 n.*, 429 (explaining that the holding rests on lack of standing and that, alternatively, seven judges would also find an Eleventh Amendment immunity bar). For two reasons, the court rejected the panel's holding that "Article III does not require a plaintiff to plead or prove that a defendant state official has enforced or threatened to enforce a statute in order to meet the case or controversy requirement when that statute is immediately and coercively self-enforcing." *Id.* at 426. First, plaintiffs could not show that the governor or attorney general caused the injury:

> [T]he panel confuses the statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants—that is, the Governor and the Attorney General. . . . Once the coercive impact of the statute (coercive in that it exposes plaintiffs to unlimited tort liability by individual plaintiffs) is understood to be distinct from the coercive power of state officials (for example, if the State could institute criminal or civil proceedings under the Act), the panel's finding of causation here is without a basis.

*Id.* Because neither the Governor nor Attorney General had not and would not initiate any of the private suits, causation was absent. *Id.*

Second, plaintiffs "fail[ed] to satisfy the 'redressability' requirement of the case or controversy analysis." *Id.* at 426. The district court's injunction was "utterly meaningless" because "no state official has any duty or ability to do *anything*." *Id.* at 427 (emphasis in original). The defendants had "no authority to prevent a private plaintiff from invoking the statute in a civil suit," and they likewise lacked "authority under the laws of Louisiana to order what cases the judiciary of Louisiana may hear or not hear." *Id.* So even though the

court did not challenge that the plaintiffs were injured, it explained that "[the plaintiffs'] injury [could not] be *redressed* by these defendants—that is, these defendants [could not] prevent purely private litigants from filing and prosecuting a cause of action under Act 825 and [could not] prevent the courts of Louisiana from processing and hearing these private tort cases." *Id.* (emphasis in original). Thus, the majority faulted the dissent for "confus[ing] the coercive impact of the statute itself and the ability—or the absence of ability—of the Governor and Attorney General to cause or redress the impact of the statute on the plaintiffs." *Id.*

Judge Higginbotham's opinion in *Okpalobi* concurred in the judgment of dismissal for lack of standing. *Id.* at 429.[7] He explained that any discussion of Eleventh Amendment immunity and *Ex Parte Young* were unnecessary because principles of standing resolve the claim: "Enjoining the named defendants from enforcing the statute will not redress the claimed wrongs. There is then no case or controversy under Article III of the Constitution." *Id.* To resolve standing, "[w]e should ask whether enjoining defendants from enforcing the statute complained of will bar its application to these plaintiffs." *Id.* at 430. The answer was no because the defendants "had no such responsibility for enforcing the statute." *Id.* That reality "ought to be the beginning and the end of this appeal." *Id.*

Relying on *Okpalobi,* the Fifth Circuit reached the same result in *LeBlanc II.* In *LeBlanc II,* abortion providers challenged the constitutionality of the private-enforcement provision of Act 825 in a lawsuit against board members of a medical-malpractice patient

---

[7] Although it is not entirely clear whether Judge Higginbotham joined Judge Jolly's opinion with respect to the issue of standing or concurred only as to the result, he found a lack of standing on the same basis—that there was no causation or redressability because the defendants had no responsibility to enforce the statute. *Id.* at 430. Thus, the Court assumes that Judge Jolly's opinion is the controlling opinion on the issue of standing. Judge Higginbotham's characterization of Judge Jolly's opinion as the lead opinion in *LeBlanc II,* 729 F.3d at 437 n.59, supports this assumption.

fund that excluded participation with respect to abortion-related procedures.  *Id.* at 433.
Addressing standing "against the backdrop of *Okpalobi*," Judge Higginbotham, writing for
the court, held that because only a private plaintiff could bring suit under the private cause
of action, the board defendants were not charged with enforcing the provision.  Therefore,
the board did not cause the complained-of injury arising from that provision.  *Id.* at 437
(citing *Okpalobi*, 244 F.3d at 428 ("[I]t is the private plaintiff, bringing a private lawsuit
under Act 825, who causes the injury of which the plaintiffs complain." (emphasis
omitted))).  The court further held that because "enjoining the board members from
'enforcing' the cause of action would not address their role in administering the [f]und[,] . . .
declaratory and injunctive relief directed at the [b]oard [defendants] would not redress the
[p]roviders' injury."  *Id.* (citing *Okpalobi*, 244 F.3d at 431–32 (Higginbotham, J.,
concurring)).  Thus, the providers lacked standing to challenge the private cause of action
against the board members because they had no authority to enforce or bring suit under that
provision.  *Id.*  But *LeBlanc II* did provide that "[t]he [p]roviders may[] . . . defensively
challenge the constitutionality" of the private cause of action in a lawsuit brought by a
private individual.  *Id.* at 437 n.61.

       In contrast with *Okpalobi* and *LeBlanc*, the Fifth Circuit found standing was present in
*Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 159 (5th Cir. 2007).  At issue was Texas House Bill
1131, which accomplished two broad reforms: (1) it prohibited an insurer from owning or
acquiring an interest in an auto-repair facility—but exempted facilities already open for
business from this requirement; and (2) it established a set of rules governing the exempted
facilities.  *Id.* at 157.  The bill included no criminal penalties but instead created a private
cause of action for any person aggrieved by a violation of the statute.  *Id.*  The bill also

allowed courts to impose civil penalties against a party that violated the statute, which
would be sent to the comptroller for deposit into the state's general-revenue fund.  *Id.*

  After the bill passed, an insurer, which owned auto-repair facilities, sued the
governor and comptroller of Texas in their official capacities, challenging the bill for
violating the dormant Commerce Clause and the First Amendment.  *Id.*  The defendants
waived their Eleventh Amendment immunity by removing the case, which was originally
filed in state court, to federal court.  *Id.* at 158.  Thus, Texas was the real party in interest.
*Id.* at 159.  Addressing standing, the court distinguished *Okpalobi* because Texas itself was a
party, as opposed to state officials who had asserted immunity.  *Id.*  As a result, causation
and redressability were "easily satisfied."  *Id.*  Texas caused the alleged injury by passing the
statute, and redressability was satisfied because a declaration of unconstitutionality directed
against the state would redress the insurer's injury by allowing the insurer to avoid penalties
and lawsuits.  *Id.*  Thus, the insurer had standing to challenge the private-enforcement
provision.  *Id.*

### 4. The Court lacks jurisdiction to consider plaintiffs' challenge to the private-enforcement provision.

  Because plaintiffs are the parties invoking federal jurisdiction, they bear the burden
of establishing each element of standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).
Although the Court assumes that plaintiffs can show injury that stems from the city's
passage of the ordinance's private-enforcement provision, they fail to show that an order
from the Court would redress the injury.  Plaintiffs admit that this Court cannot force the
city to revoke or amend its ordinance.  *See* Dkt. No. 48 at 17.  They also concede that any
order from this Court regarding the ordinance's constitutionality or validity would not bind
the state courts that would hear the private-enforcement suits.  *See* Dkt. No. 40 at 10–11.

Instead, plaintiffs claim that a declaration of invalidity from the Court may deter lawsuits and may help convince state courts of plaintiffs' arguments. Dkt. No. 48 at 18–19. But this potential relief is too speculative to show, as they must, that the Court's order would likely redress their injury. And while the Court recognizes that *Allstate*, if read in isolation, supports their position, the Court concludes that *Okpalobi* and *LeBlanc* undermine their assertion that *Allstate* controls. After carefully examining the three cases, the Court concludes that *Okpalobi* and *LeBlanc* control. Finally, case law undermines plaintiffs' position that they must be able to seek pre-enforcement relief here because no other effective relief is available. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 625 (1996) (affirming the Colorado Supreme Court's decision that an amendment to the state constitution that precluded any judicial, legislative, or executive action designed to protect persons from sexual-orientation discrimination was unconstitutional). Although additional litigation is inevitable in other venues, plaintiffs lack standing in this case, so the Court dismisses for lack of jurisdiction.

### A. *Okpalobi*'s holding controls this case and is materially indistinguishable.

The city argues that *Okpalobi* controls in this case and mandates a finding of no standing. The Court agrees. Like the statute in *Okpalobi*, the ordinance's private-enforcement mechanism creates a private right of action against abortion providers that the city has no authority to enforce. *See Okpalobi*, 244 F.3d at 426–27; Dkt. No. 14 at 139. And as the plaintiffs admit in their briefing, like the defendants in *Okpalobi*, the city and its officials have no authority to prevent a private plaintiff from invoking the ordinance or to tell the state courts what cases they may hear. *See Okpalobi*, 244 F.3d at 427; Dkt. No. 40 at 6–7. Accordingly, like the providers in *Okpalobi*, the plaintiffs here have failed to show that an order from this Court would redress their alleged injury.

Plaintiffs' attempt to distinguish *Okpalobi* based on the state officials' Eleventh Amendment immunity, in contrast to the city's lack of governmental immunity, falls short. First, plaintiffs' argument that *Okpalobi*'s standing analysis turned on Eleventh Amendment immunity and the need to invoke *Ex Parte Young* overextends the opinion.  The lead opinion made clear that the application of Eleventh Amendment immunity and *Ex Parte Young* was an alternative holding, 244 F.3d at 429, which did not receive a majority, *id.* at 408 n.*. And Judge Higginbotham's concurrence did not reach the issue; instead, he held that standing must be resolved before immunity, *id.* at 430.  Thus, while *Okpalobi* analyzed whether the particular defendants caused the injury and could remedy it, the opinion did not turn on Eleventh Amendment immunity and *Ex Parte Young* as the plaintiffs contend.

Second, even assuming *Okpalobi* did turn on Eleventh Amendment immunity and *Ex Parte Young*, this distinction would be immaterial.  Plaintiffs argue that *Okpalobi* did not find redressability absent because the government itself could not prevent private suits but, instead, because of the inability to force the named defendants to provide relief due to immunity.  Dkt. No. 40 at 9.  But despite the city's lack of governmental immunity, the plaintiffs concede that, like the defendants in *Okpalobi*, the city is powerless to prevent private plaintiffs from invoking civil suits.  *See* Dkt. No. 40 at 10.

Plaintiffs' concession is justified because multiple considerations demonstrate this reality.  First, a declaratory judgment declares only the rights of the parties in the case.  28 U.S.C. § 2201 ("In a case of actual controversy[,] . . . any court of the United States[] . . . may declare the rights . . . of any interested party seeking such declaration . . . .").  Second, an injunction does not bind unrelated nonparties.  *Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 314 (5th Cir. 1999) ("[A]n injunction does not bind a non-party unless he

stands in a special relationship to a party.").  Third, even though this Court can rule that a law is unconstitutional when presiding over an actual case or controversy, it can only "hold laws unenforceable; [it cannot] . . . erase them."  *Pool v. City of Houston*, 978 F.3d 307, 309 (5th Cir. 2020).  As a result, the Court lacks authority to order the city to revoke any portion of the ordinance.  Fourth, even the plaintiffs admit that an order in this case will not prevent private suits.  Dkt. No. 40 at 10.  And fifth, Texas "state courts are not bound by Fifth Circuit [or federal district-court] precedent when making a determination of federal law." *Magouirk v. Phillips*, 144 F.3d 348, 361 (5th Cir. 1998); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 n.21 (1997) (noting that a federal district-court judgment was not binding on state courts).  Thus, as in *Okpalobi* and despite the fact that the city does not have governmental immunity, an order from the Court enjoining the city or declaring the law invalid would, for redressability purposes, be "utterly meaningless."  *See* 244 F.3d at 426.

Given the factual similarities between this case and *Okpalobi* and that it is not distinguishable solely due to the city's lack of immunity, the Court concludes that *Okpalobi* controls and precludes plaintiffs' attempt to show redressability.

### B.   *Allstate* **is distinguishable.**

Plaintiffs argue that *Allstate* controls this case, but the case is distinguishable.[8]  Most notably, and as the court specifically stated, "the state [was] the real party in interest" in

---

[8] The city asserts that *Allstate* does not control this case because it conflicts with *Okpalobi* and, pursuant to the rule of orderliness, *Okpalobi* is the controlling precedent.  Dkt. No. 31 at 10–11.  The Court does not invoke the rule of orderliness because it has identified distinctions between *Allstate* and *Okpalobi* and has attempted, as it must, to reconcile the two opinions.  But the Court agrees that if these opinions are incompatible, the rule of orderliness would provide that *Okpalobi* controls.  *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court."); *Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 (5th Cir. 2000) ("[U]nder

*Allstate.* 495 F.3d at 159.  Because the state itself, and not just a state officer, was the

defendant, any declaratory or injunctive relief awarded bound the entire state, which

necessarily includes the state courts.  *See* Fed. R. Civ. P. 65(d)(2) (providing that every

injunction binds not only the parties, but "the parties' officers, agents, servants, employees,

and attorneys," along with any "other persons who are in active concert or participation

with [them])"; *see also Allstate*, 495 F.3d at 159 (providing that a state official sued in his or

her official capacity "is essentially a suit against the state"); *see Echols  v. Parker*, 909 F.2d

795, 799–81 (5th Cir. 1990) (affirming order directing the State of Mississippi, although not

a party, to pay the plaintiffs' Section 1988 attorney's fees because the local officials

involved, including a justice court judge, had been sued in their official capacity for

enforcing an unconstitutional state statute and had acted as agents of the state).  Thus, as

agents of the state, the *Allstate* injunction bound the state courts in which the relevant

lawsuits were brought.  *See id.*

      In contrast, an injunction against the city would not bind the state courts that will

hear private-enforcement actions under the ordinance.  As explained previously, the city

does control its municipal courts of record, but those courts do not have jurisdiction over

private-enforcement actions.  Thus, an injunction or declaration against the city would not

have the same effect as the order in *Allstate* because it will not bind the courts in which the

private-enforcement actions will be brought.

      In an attempt to avoid this conclusion, plaintiffs argue that the order in *Allstate* did

not bind the state courts because a state-court judge could not be held in contempt of court

---

the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer
language has no effect.").

for ignoring it, Dkt. No. 40 at 8, but this argument is beside the point.  Even assuming plaintiffs correctly assert that a state-court judge cannot be held in contempt for violating *Allstate*, the opinion still had binding effect on the full state and its agents, which includes the state courts.  *See* 495 F.3d at 159; Fed. R. Civ. P. 65(d)(2).

Additionally, *Allstate*'s reliance on *Franklin v. Massachusetts*, 505 U.S. 788 (1992), undermines plaintiffs' argument.  To support its finding that a declaration of unconstitutionality would redress the injury from the private cause of action at issue by preventing lawsuits, *Allstate* cited *Franklin*.  *Allstate*, 495 F.3d at 159 n.19.  The citation included a parenthetical opining that under *Franklin*, redressability is satisfied where actors who are not parties could be expected to amend their conduct in response to a court's declaration.  *Id.*  But Texas state-court judges have no obligation to follow a federal district-court or circuit-court decision.  *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) ("While Texas courts may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, in determining the appropriate federal rule of decision, they are obligated to follow only higher Texas courts and the United States Supreme Court.").  Thus, Texas state-court judges could not have been expected to disallow lawsuits under the private cause of action at issue unless they themselves, as part of the State of Texas, were bound by the ruling in *Allstate*.  Accordingly, the Court rejects plaintiffs' contention that the order in *Allstate* did not bind the state courts and finds that *Allstate* is distinguishable on that basis.

Finally, unlike the private-enforcement provision in the ordinance, the statute in *Allstate* included a civil-penalty provision that allowed state courts to impose a civil penalty for deposit into the state's general-revenue fund.  *See* 495 F.3d at 157; Dkt. No. 14 at 139.

Thus, given the state's waiver of Eleventh Amendment immunity in *Allstate*, an injunction against the state generally would redress the injury caused by imposition of civil penalties because it would bar the state, including the comptroller, from receiving a penalty payment. *See* 495 F.3d at 159.  Here, because the city cannot bring a private-enforcement action, an injunction against the city would not cause the redress that occurred in *Allstate*.

### C.   Redressability is not automatically present due to the city's lack of governmental immunity.

The plaintiffs argue that *Allstate* created a general rule that in a suit against a government entity challenging a provision that the entity passed, redressability is met where the entity does not have immunity.  Dkt. No. 32 at 14.  But *Allstate* does not create such a rule.  In fact, even in *Allstate*, where there was no immunity shielding the board defendants from liability, the court still analyzed whether an order against the real party in interest—the state in that case—would redress the injury.  495 F.3d at 159.

Moreover, *LeBlanc II* undermines plaintiffs' theory.  Tellingly, the *LeBlanc II* court addressed the standing question first and without reliance on whether the parties sued had Eleventh Amendment immunity.  729 F.3d at 437, 439–40.  Additionally, *LeBlanc II*, which came after *Allstate*, found a lack of standing to challenge the private-enforcement mechanism despite also finding that Eleventh Amendment immunity did not bar suit against the defendants on another ground.  *See id.*  In fact, the court relied on *Okpalobi* to find that the abortion providers lacked standing to challenge the private cause of action despite later holding that the defendants did not have Eleventh Amendment immunity as a shield from a separate claim.  *Id.*  Accordingly, *LeBlanc II* confirms that *Allstate* did not create the general rule on which plaintiffs rely.

25

*LeBlanc II* mandates dismissal here and confirms that the nonexistence of governmental immunity does not make this case distinguishable from *Okpalobi*. Like the statute challenged in *LeBlanc II*, the ordinance creates a private right of action against abortion providers that the city cannot enforce. *See* 729 F.3d at 437; Dkt. No. 14 at 139. Also, like the board defendants in *LeBlanc II*, the city cannot prevent private plaintiffs from invoking the ordinance or tell the state courts what cases to hear. *See* 729 F.3d at 437; Dkt. No. 40 at 10–11. And in *LeBlanc II*, the Fifth Circuit found that, like the city in this case, the defendants were not immune from suit. 729 F.3d at 439–40; Dkt. No. 39 at 6–7. Finally, *LeBlanc II* reached the same result as *Okpalobi* even though the board defendants lacked Eleventh Amendment immunity. 729 F.3d at 437. Following *LeBlanc II*, the Court finds that the city's lack of governmental immunity does not make this case distinguishable from *Okpalobi*.

### D.   That an order from this Court may deter some plaintiffs from filing suit does not establish redressability.

The defendants argue that redressability is met because an order from the Court declaring the private-enforcement provision invalid will deter parties from using that provision to bring lawsuits. But this argument does not withstand scrutiny. Most simply, if plaintiffs were correct, then *Okpalobi* and *LeBlanc* would have come out differently. In those cases, the same deterrent effect would have been present if the court had issued an order stating that the private-enforcement provision was invalid. If such an effect were sufficient to establish redressability, the Fifth Circuit would have found standing in those cases. Thus, *Okpalobi* and *LeBlanc* do not support the plaintiffs' proposition that the deterrent effect of a court order is sufficient to redress their injury for purposes of standing. *Cf. Younger v. Harris*, 401 U.S. 37 (1971) (holding that the federal courts did not have jurisdiction over claims

26

brought by plaintiffs who had not been threatened with prosecution under an allegedly unconstitutional criminal statute and only alleged that they felt inhibited by the statute).

Plaintiffs also rely on *Franklin v. Massachusetts*, 505 U.S. 788 (1992), to support their argument that a declaration of invalidity would redress their injury because litigants would abide by the declaration, but *Franklin* is distinguishable.  In *Franklin*, the State of Massachusetts and two registered voters sued the President and the Secretary of Commerce challenging use of certain data to allocate federal overseas employees to states during a census.  *Id.* at 790, 795.  Because the President personally transmitted the allocations to Congress after receiving a report from the Secretary of Commerce, he was the individual who took the final action that affected Massachusetts and the voters who sued.  *Id.* at 799.  Considering whether the plaintiffs met the redressability requirement of standing, the Supreme Court explained that it did not need to resolve whether it could enjoin the President because "the injury alleged is likely to be redressed by declaratory relief against the Secretary [of Commerce] alone.  *Id.* at 802–03.  To reach this conclusion, the Court noted that it was substantially likely that the President would abide by the interpretation of the law in the declaration that was binding on the Secretary of Commerce despite not being directly bound by it.  *Id.* at 803.

Such a likelihood does not exist in this case.  Unlike the President and the Secretary of Commerce in *Franklin*, the courts that could preside over private-enforcement actions are not part of the same government entity as, or associated with, the party to be enjoined—the city.  Additionally, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."  *Camreta v. Greene*, 563 U.S. 692, 709 (2011).  And state courts have no

obligation to follow a district-court decision.  *Penrod Drilling Corp.*, 868 S.W.2d at 296.
Thus, unlike the unique circumstances presented in *Franklin*, there is no substantial
likelihood here that any other court presiding over an action brought under the private-
enforcement provision would abide by an injunction against the city or a declaration by this
Court that the provision is unconstitutional.

Additionally, plaintiffs argue that "courts routinely hold, in cases where the
government lacks sovereign immunity, that declaring a law invalid is sufficient to redress an
injury that flows from the application of the law," but the cases that plaintiffs cite to support
this proposition are inapplicable here.  Plaintiffs first cite *Fusilier v. Landry*, 963 F.3d 447 (5th
Cir. 2020), which involved a challenge to the at-large elections for five judicial seats in a
Louisiana voting district under the Voting Rights Act.  *Id.* at 453.  The plaintiffs in that case
sued Louisiana's governor, attorney general, and secretary of state, but the secretary of state
was dismissed with prejudice prior to trial.  *Id.*  The district court rejected the governor and
attorney general's arguments that the plaintiffs lacked standing and found that the at-large
voting system violated the Voting Rights Act.  *Id.*  As a result, the district court enjoined the
governor and attorney general from conducting an election where the judges in the district
at issue were elected at an at-large basis.  *Id.*  Only the attorney general appealed.  *Id.*

On appeal, the attorney general argued that the plaintiffs lacked standing to bring the
claims.  *Id.* at 454.  The court noted that the governor, "as chief executive, . . . plays a
pivotal role in the enactment of legislation that could address any adverse federal
judgment."  *Id.*  *Fusilier* further noted that a declaration would be sufficient to redress the
plaintiffs' injuries because "it would force the state—who the [g]overnor, in his official
capacity represents—to prescribe another plan before proceeding with elections."  *Id.* at 454

n.3.  Accordingly, the Fifth Circuit held that the plaintiffs did have standing.  *Id.* at 454.  In a footnote, *Fusilier* limited its holding to the context of suits brought under the Voting Rights Act and clarified that its holding did "not authorize parties to sue the [g]overnor (or other state officer) whenever a party challenges duly enacted laws."  *Id.* at 454 n.5.

The present case obviously does not involve Voting Rights Act claims, and in contrast to *Fusilier*—where an injunction and declaration of unconstitutionality would apply as to future activity of the state—the city will not engage in any future activity with respect to the private-enforcement provision.  Thus, *Fusilier* is inapplicable and does not support the plaintiffs' allegation that where the government lacks immunity, a declaration of unconstitutionality will necessarily redress injury flowing from the challenged law.

The plaintiffs also cite *OCA-Greater Houston v. Texas*, 867 F.3d 604, 607 (5th Cir. 2017), but this case is also distinguishable.  In *OCA*, a voting organization argued that Texas's requirement that a voter's chosen interpreter must be registered to vote in the voter's county of residence violated the Voting Rights Act.  *Id.* at 609.  The voting organization sued Texas and Texas's secretary of state.  *Id.*  On appeal, Texas argued that the voting organization's injury was not caused by the state's conduct or redressable by an order against the state and secretary of state.  *Id.* at 612–13.  Judge Higginbotham, writing for the court, distinguished *Okpalobi* on the basis that the statute created no private right of action, and the Texas secretary of state was responsible for enforcing statute.  *Id.* at 613–14.

In contrast to *OCA*, the plaintiffs in this case challenge a private right of action that the city has no responsibility for enforcing.  Additionally, considering Judge Higginbotham's distinction of *Okpalobi* and emphasis on the fact that the officials sued were responsible for enforcing the voting statute at issue, *OCA* also does not stand for the

proposition that where the government lacks Eleventh Amendment or state sovereign immunity, a declaration of unconstitutionality will redress injury flowing from the challenged law.

Finally, plaintiffs argue that the law does not require them to wait to be sued before seeking relief from the ordinance.  For support, they cite *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000) and *Steffel v. Thompson*, 415 U.S. 452 (1974), but neither case supports their right to receive pre-enforcement review in a lawsuit *against the city*.  In *Santa Fe*, students brought an Establishment Clause challenge against a school district's policy that allowed a student to give an invocation at football games.  530 U.S. at 294–98.  Without analyzing whether the students had standing to bring their claims, the Supreme Court reviewed it and held that the policy violated the Constitution.  *Id.* at 317.  And in *Steffel*, the plaintiff sued individuals who reported that he was violating a criminal statute and the officials responsible for enforcing it, who had threatened prosecution.  415 U.S. at 455–56.  He sued for declaratory relief that the statute violated his First and Fourteenth Amendment rights.  *Id.*  The Supreme Court held that by alleging threats of prosecution, the individual presented an actual controversy under Article III and that even though a declaration may not have the force and effect of an injunction, it has the force and effect of a final judgment and would deter those responsible for enforcement from enforcing it.  *Id.* at 459, 469–71.  Thus, the Supreme Court held that "regardless of whether injunctive relief may be appropriate, federal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute."  *Id.* at 475.

Unlike the city in this case, the school district in *Santa Fe* and the defendants in *Steffel* were responsible for enforcing the challenged provision. Thus, in contrast to this case, the judgment issued directly against—and prohibited—the enforcing party from taking action to enforce the provisions. Accordingly, even though the Supreme Court in *Steffel* noted that a non-binding declaratory judgment does provide relief by deterring enforcement of an unconstitutional statute, the deterrent relief referred to in that case is different than any deterrent relief that could occur in this case because the party sued here—the city—does not enforce the challenged provision. Therefore, both *Santa Fe* and *Steffel* are distinguishable from this case and do not stand for the proposition that a party has standing to file a pre-enforcement suit against the party that enacted the provision but lacks authority to enforce it. Accordingly, *Santa Fe* and *Steffel* do not establish that plaintiffs have standing to bring this pre-enforcement suit against the city.[9]

This reality is borne out by the many cases where the party affected by a law, ordinance, or regulation raised constitutional protections in a defensive posture after being sued for its conduct. It is simply not the case that because someone might suffer a burden on their constitutional rights, the person is granted an automatic entrance into federal court. Plaintiffs argue it would be unusual for them to not be able to preemptively challenge a statute that could allegedly lead to a burden on their constitutional rights. But there is nothing unusual about that at all. In fact, there are many examples of constitutional challenges raised in a defensive posture. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-*

---

[9] This does not mean, of course, that plaintiffs may never bring a pre-enforcement against any party. But they have not met Article III's standing requirements in this suit against the city. *Compare MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129–30, 137 (2007) ("We hold that petitioner was not required, insofar as Article III is concerned, to break or terminate its 1997 license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed.").

*Berru*, 140 S. Ct. 2049 (2020) (indicating that religious schools may raise a First Amendment claim defensively after being sued for employment discrimination); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp. Opportunity Comm'n*, 565 U.S. 171 (2012) (same); *Masterpiece Cakeshop, Ltd., v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) (showing that a cake baker could raise Free Exercise and Free Speech claims defensively after being sued for violation of the Colorado Anti-Discrimination Act).

### E.   Denying standing here will not prevent plaintiffs or any other party from asserting constitutional rights that the ordinance allegedly violates.

Plaintiffs argue that a finding of no standing in this case is improper because it would prevent them from asserting their rights and the constitutional rights of women seeking abortions. Dkt. No. 43 at 4. But plaintiffs themselves admit that a finding of no standing does not prevent them from asserting the constitutional rights of women as a defense in a suit brought under the private-enforcement provision. Dkt. No. 32 at 5. In fact, the ordinance anticipates the assertion of such a defense. Dkt. No. 14 at 140. It explicitly allows individuals sued under the private-enforcement provision to "assert . . . *Roe v. Wade*, . . . *Planned Parenthood v. Casey*, . . . or any other abortion-related pronouncement of the Supreme Court as a defense to liability." *Id.* And if the plaintiffs were successful in the state appellate court, they would have a precedent foreclosing private-enforcement suits in the city, as opposed to a non-binding declaration from this Court. *See LeBlanc II*, 729 F.3d at 437 n.61 (explaining that "[t]he [p]roviders may[] . . . defensively challenge the constitutionality" of the private cause of action in a lawsuit brought by a private individual).

The Court also rejects any suggestion by the plaintiffs that when presiding over a lawsuit asserted under the private-enforcement provision, state courts would not adequately consider any constitutional defenses raised. To the contrary, state courts can and do

consider constitutional issues effectively.  In *Romer v. Evans*, for example, Colorado passed

an amendment to its constitution, and parties affected by that amendment sued the governor

and attorney general in state court alleging that enforcement of the amendment would

violate their constitutional rights.  517 U.S. 620, 624–25 (1996).  The trial court granted a

preliminary injunction staying enforcement of the amendment on the basis that it was

unconstitutional.  *Id.* at 625.  The Colorado Supreme Court affirmed, as did the United

States Supreme Court.  *Id.* at 625–26.

* * *

Because *Okpalobi* and *LeBlanc* are indistinguishable and binding on the issue of

redressability, *Allstate* is distinguishable, and the plaintiffs' other arguments pertaining to

redressability lack merit, the Court finds that plaintiffs have failed to show redressability for

standing to challenge the private-enforcement provision.  Thus, the Court finds that the

plaintiffs lack standing to pursue those claims and dismisses them for lack of jurisdiction.

## 5.    Even if the plaintiffs had standing, the Court would abstain under *Pullman*.

Assuming arguendo that the plaintiffs have standing, the Court would alternatively

be compelled to abstain under the *Pullman* doctrine and basic concepts of federalism.  *See*

*R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *see also Umphress v. Hall*, No. 4:20-

CV-00253-P, 2020 WL 6701364, at *7 (N.D. Tex. Nov. 12, 2020) (concluding that the court

lacked jurisdiction and, alternatively, that it would abstain under *Pullman*).  "[U]nder the

*Pullman* doctrine, a federal court should abstain from exercising its jurisdiction 'when

difficult and unsettled questions of state law must be resolved before a substantial federal

constitutional question can be decided.'"  *Nationwide Mut. Ins. Co. v. Unauthorized Prac. of*

*Law Comm.*, 283 F.3d 650, 652 (5th Cir. 2002) (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)).

The policy underlying *Pullman* abstention is that federal courts should avoid "premature constitutional adjudication," *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 306 (1979) (citation omitted), and the risk of rendering advisory opinions, *Moore v. Sims*, 442 U.S. 415, 428 (1979) ("[T]he *Pullman* concern [is] that a federal court will be forced to interpret state law without the benefit of state-court consideration and . . . render[ ] the federal-court decision advisory and the litigation underlying it meaningless.") (citation omitted). *Pullman* avoids "federal-court error in deciding state-law questions antecedent to federal constitutional issues," by allowing for parties to adjudicate disputes involving "unsettled state-law issues" in state courts. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997).

For *Pullman* abstention to be appropriate, the case "must involve (1) a federal constitutional challenge to state action and (2) an unclear issue of state law that, if resolved, would make it unnecessary for [the federal court] to rule on the federal constitutional question." *Moore v. Hosemann*, 591 F.3d 741, 745 (5th Cir. 2009) (citation and ellipses omitted). The Fifth Circuit has noted that "[t]he second factor is flexible—it is satisfied if the constitutional questions will be 'substantially modified,' *id.*, or otherwise 'present[ed] in a different posture,' *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980)." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 397 n.13 (5th Cir. 2020).

In *Pullman*, the "plaintiffs challenged, on both federal constitutional and state law grounds, the authority of the Texas Railroad Commission to issue a racially discriminatory order." *Hosemann*, 591 F.3d at 745 (citing *Pullman*). The Supreme Court ordered the district

court to abstain "from deciding the case, because it found that if Texas courts were to strike down the Commission's action on state law grounds, it would be unnecessary to decide the federal constitutional question." *Id.* The Supreme Court later explained that "[b]y abstaining in such cases, federal courts will avoid both unnecessary adjudication of federal questions and 'needless friction with state policies.'" *Haw. Hous. Auth.*, 467 U.S. at 236 (quoting *Pullman*, 312 U.S. at 500). Notably, there was no pending state case when the Supreme Court decided *Pullman*.

The Fifth Circuit has repeatedly emphasized that "abstention is the exception, not the rule." *Nissan Motor Corp. in U.S.A. v. Harding*, 739 F.2d 1005, 1008 (5th Cir. 1984). Moreover, the fact that "state courts have not interpreted the subject statute [or ordinance] is not determinative: federal courts should exercise their jurisdiction if the state law in question is clear." *Id.*

If the requirements for abstention are met, "the district court must assess the totality of the circumstances presented by a particular case, considering the rights at stake and the costs of delay pending state court adjudication." *Baran v. Port of Beaumont Nav. Dist. of Jefferson Cty. Tex.*, 57 F.3d 436, 442 (5th Cir. 1995). "While federal courts have often pointed to the presence of a pending state action as one factor supporting abstention," the absence of a pending state proceeding does not necessarily prevent abstention. *Duncan v. Poythress*, 657 F.2d 691, 697 (5th Cir. Unit B Sept. 1981). In fact, "[i]n some cases, the probability that any federal adjudication would be effectively advisory is so great that this concern alone is sufficient to justify abstention, even if there are no pending state proceedings in which the question could be raised." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n.9 (1987) (citing *Pullman*). "Similarly, when the state-law questions have concerned

matters peculiarly within the province of the local courts," the Supreme Court has inclined toward abstention. *Id.* But where the litigation "has already been long delayed" or it seems "unlikely that resolution of the state-law question would significantly affect the federal claim," the court may not be required to abstain. *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 84 (1975).

Courts have applied *Pullman* abstention where it is unclear whether a city ordinance is valid under state law and the resolution of that state issue would render the federal constitutional challenge moot. For example, the Supreme Court found abstention appropriate where "the dispute in its broad reach involve[ed] a question as to whether a city has trespassed on the domain of a State." *City of Chicago v. Fieldcrest Dairies, Inc.*, 316 U.S. 168, 172 (1942). In *Fieldcrest Dairies*, a milk distributor sought a declaratory judgment that its paper milk cartons were not prohibited by a Chicago ordinance requiring that milk products sold in quantities less than one gallon be delivered in standard milk bottles, or if they were, the ordinance was invalid under a state statute and the state and federal constitutions. *Id.* at 169–71. A pending lawsuit in state court sought identical relief. *Id.* at 173. The Supreme Court reversed the Seventh Circuit's decision rendering the ordinance void because it held that abstention was required under *Pullman*:

> We are of the opinion that the process which we followed in the *Pullman* case should be followed here. Illinois has the final say as to the meaning of the ordinance in question. It also has the final word on the alleged conflict between the ordinance and the state Act. The determination which the District Court, the Circuit Court of Appeals, or we, might make could not be anything more than a forecast—a prediction as to the ultimate decision of the Supreme Court of Illinois.

*Id.* at 171–72.

Conversely, *Pullman* abstention has been found inappropriate where a challenged ordinance is facially unambiguous, and no uncertain question of state law existed.  *See, e.g.*, *City of Houston v. Hill*, 482 U.S. 451, 468 (1987) (holding that abstention was inappropriate in a case involving a First Amendment facial challenge to a municipal ordinance because the ordinance was unambiguous on its face and an interpretation by the state court could not avoid or modify the constitutional rulings).  Additionally, it has been found inappropriate when an unambiguous ordinance is challenged based on a broad state constitutional provision that merely mirrors the federal constitutional rights claimed abridged.  *See, e.g.*, *La. Debating and Literary Ass'n*, 42 F.3d 1483, 1491–92 & n.10 (5th Cir. 1995) (holding that that the trial court did not abuse its discretion by declining to exercise *Pullman* abstention in a suit challenging a city's antidiscrimination ordinance because the ordinance was not so inter-related with a broad state constitutional provision so as to be ambiguous); *see also Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 598 (1976) (explaining that "to hold that abstention is required because [an ordinance] might conflict with . . . . broad and sweeping [state] constitutional provisions, would convert abstention from an exception into a general rule").

## A.    The Court finds that the prerequisites for *Pullman* abstention are met.

Applying these principles to this case, the Court finds that *Pullman* abstention is warranted based on plaintiffs' ultra-vires claim.

*Pullman*'s first prong is clearly satisfied.  This case involves a challenge to a local ordinance based on both state law and federal constitutional grounds.  Plaintiffs argue that the ordinance violates the Due Process clause of the Fourteenth Amendment.  Plaintiffs also argue that the ordinance's private-enforcement mechanism is invalid for two primary

reasons: (1) Texas law does not empower or permit municipalities to create civil liability between parties, and (2) it conflicts with—and is preempted by—the Texas Penal Code and Texas's wrongful death statute.  Dkt. No 1 ¶¶ 42–47; Dkt. No. 13 at 8, 25–28.

"To satisfy the second prong, there must be an uncertain issue of state law that is 'fairly susceptible' to an interpretation that would render it unnecessary for us to decide the federal constitutional questions in a case."  *Nationwide Mut. Ins. Co.*, 283 F.3d at 653. Plaintiffs claim that the second element is not met because the text of the ordinance itself is not ambiguous.  Dkt. No. 45 at 8.  Additionally, they allege that to the extent any unsettled or unclear issues of state law do exist, those issues are independent of the federal constitutional claim, and therefore, abstention is not appropriate.  *Id.* at 5–6.  While the Court agrees that the ordinance is not facially ambiguous, the Court disagrees that abstention is inappropriate merely because the state-law claims might not be directly related to the subject of the federal constitutional claim.

The parties indicate in their briefing that *Pullman* abstention only applies when the state-law issues are "intertwined with," "bound to," "premised on," or otherwise directly related to the federal-constitutional claim.  *Id.*; Dkt. No. 44 at 6–7 (citing *Harris Cty. Comm'rs Ct.*, 420 U.S. at 83 (stating that "when a federal constitutional claim is *premised on* an unsettled question of state law," abstention may be appropriate to allow state courts an opportunity to settle the underlying state-law question and avoid the possibility of unnecessarily deciding a constitutional question") (emphasis added)).  While the Court recognizes that cases applying *Pullman* are generally faced with unsettled interpretations of ordinances or state laws that are *premised on* or more directly intertwined with a federal

constitutional claim, that is not always the case.  Nor does the Court find any binding

authority requiring such an inflexible interpretation of *Pullman*.

In fact, the Ninth and Tenth Circuits have found *Pullman* abstention appropriate

under circumstances similar to this, where it was unclear whether a city ordinance was

preempted by state law, and resolution of the state-preemption issue would render the

separate constitutional challenge unnecessary.  *See, e.g.*, *Cedar Shake & Shingle Bureau v. City

of Los Angeles*, 997 F.2d 620, 622–26 (9th Cir. 1993); *Caldara v. City of Boulder* 955 F.3d 1175,

1179–83 (10th Cir. 2020).  In *Cedar Shake*, a manufacturer and distributor of fire-retardant

wood shake and shingle roofing materials brought suit against the city challenging an

ordinance banning use of any wood shake and shingle roofing materials in new construction

based on two grounds—that the ordinance was preempted by state statutory law and that

the ordinance violated the Equal Protection Clauses of the federal and state constitutions.

*Id.* at 621.  The Ninth Circuit held that the district court should have abstained from ruling

on the constitutionality of the city ordinance because it was uncertain whether the ordinance

was preempted by state law, and a definitive ruling on this sensitive issue by a state court

could obviate the need for a federal decision on the constitutional claim.  *Id.* at 626.

Similarly, in *Caldara v. City of Boulder*, the Tenth Circuit affirmed a district court's

decision to abstain from resolving challenges to a city ordinance prohibiting the sale or

possession of assault weapons within the city, in part, because there was an uncertain issue

of state law—whether the ordinance conflicted with Colorado statutes.  955 F.3d 1175,

1179–83 (10th Cir. 2020).  The panel explained that (1) the Colorado Supreme Court split

evenly on the preemption issue; (2) that the issue was complex and potentially decisive; and

(3) that a federal decision "would risk intrusion into important state functions."  *Id.* at 1181.

This case largely mirrors the posture in both *Cedar Shake* and *Caldara*.  Like *Cedar Shake* and *Caldara*, this case involves a challenge to a city ordinance based on both state-preemption grounds and federal constitutional grounds.  Additionally, here, the state-law issues are potentially decisive and likely risk intrusion into sensitive issues and important state functions.  Thus, as a preliminary matter, the Court finds that an abstention analysis is appropriate.  The fact that the Fourteenth Amendment claim in this case is not topically related to the state challenges should not foreclose application of *Pullman* abstention, especially in light of this persuasive authority from the Ninth and Tenth Circuits and the Fifth Circuit's recognition that the second prong of *Pullman* is "flexible."  *See Tex. Democratic Party*, 961 F.3d at 397 n.13.

Moreover, even assuming the plaintiffs' inflexible view of the law is correct, and the state issues and federal constitutional issues must be strictly related, the Court finds that the constitutional issue here is still "premised on" the state issues.  Although the issues do not involve the same subject matter, the constitutional claim necessarily depends on the validity of the city ordinance.  Thus, if the city is incorrect as a matter of state law, then the entire ordinance—and any federal issues that result—fall away.  Thus, the Court finds that abstention is not barred as a matter of law as the plaintiffs suggest.  *See Pullman*, 312 U.S. at 500–01 (abstaining when the existence of a federal constitutional issue depended on an order of questionable validity under state law).[10]

---

[10] The Texas Solicitor General agrees with this conclusion.  Dkt. No. 47 at 6 (explaining that, assuming that the state-law issues are unclear, "*Pullman* abstention is appropriate here"; plaintiffs' contention "contradicts *Pullman* itself"; and plaintiffs are mistaken to claim that "abstaining here would extend *Pullman* beyond its limits").

Because the Court finds that resolution of the state-law claims could render the plaintiffs' constitutional claim moot, the determinate issue here is whether either of the state-law issues are uncertain or unsettled.  Because this case involves a newly enacted ordinance, the relevant questions of state and local law have not been adjudicated by a state court.  While this fact alone is not determinative, it may provide some evidence that the state-law issues are unsettled.  The Court addresses each state-law issue below.

> ### i.    Due to a lack of authority and the parties' conflicting arguments, it is currently unclear whether Lubbock had authority under Texas law to create civil liability between private parties.

Plaintiffs allege that the city lacks legislative authority to create civil liability between private parties.  *See* Dkt. No. 1 ¶¶ 42–43; Dkt. No. 13 at 25–27.  Conversely, the defendant argues that the ordinance is not ultra vires because the legislature has not placed limitations on home-rule cities prohibiting the creation of private rights of action.  Dkt. No. 44 at 8.

Lubbock is considered a home-rule city.  *See* Lubbock City Charter, 1 art. XI; Tex. Const. art. XI, § 5.  Home-rule cities are those operating under a municipal charter as provided for in the Texas Constitution.  *Barnett v. City of Plainview*, 848 S.W.2d 334, 337 (Tex. App.—Amarillo 1993, no pet.).  "Home-rule cities possess the full power of self government and look to the Legislature not for grants of power, but only for limitations on their power."  *Dallas Merch's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490–91 (Tex. 1993).  Texas may limit the authority of home-rule cities through "either an express limitation or one arising by implication," but the Texas Supreme Court has "never delineated the distinction between the two."  *BCCA Appeal Grp. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016) (citing *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W. 2d 641, 645 (Tex. 1975)).

Texas law expressly grants municipalities the power to adopt ordinances and to enforce their ordinances themselves. *See* Tex. Loc. Gov't Code § 51.001, §§ 51.071–51.079, § 54.001. The private-enforcement mechanism here would not be enforced by the municipality or its courts, however. Thus, there is a question of whether Texas law permits municipalities to delegate enforcement to private parties through civil actions.

Neither party has identified state law clearly limiting or prohibiting home-rule cities from creating private rights of action, nor have they presented Texas case law resolving this issue. The complete lack of authority from the state provides strong evidence that this issue remains unclear and unsettled.

Despite the lack of authority on this issue, plaintiffs assert that Texas law reflects a "well-established general rule" that, absent an express grant of authority from the state, "a municipal corporation cannot create by ordinance a right of action between third persons or enlarge the common law or statutory duty or liability of citizens among themselves." Dkt. No. 13 at 26 (citing 6 McQuillin Mun. Corp. § 22:1 (3d ed. 2020)).[11] Plaintiffs' position largely relies on the McQuillin treatise and case law from other states recognizing this purported "well-established general rule." Dkt. No. 13 at 26–27. This authority is not persuasive in this case, which involves a novel question of Texas state law, and the Court disagrees that any "well-established general rule" exists in Texas.

Plaintiffs also cite *City of Corpus Christi v. Texas Driverless Co.*, 190 S.W.2d 484, 485 (1945), for the proposition that "only the [state] legislature is authorized to change the common law" to expand tort liability. Dkt. No. 13 at 19. But that quoted portion of the

---

[11] Plaintiffs note that Texas courts have relied on the McQuillan treatise for legal principles regarding municipalities. *Keaton v. Ybarra*, 552 S.W.2d 612, 614 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.).

opinion appears to restate a party's position; it does not represent the court's interpretation of the law. "Indeed, the *Texas Driverless Co.* court expressly concluded that it 'need not' decide the city's authority to expand tort liability beyond that provided at common law 'since the questioned ordinance has not at all undertaken to enlarge the common law liability of the owners of rented automobiles.'" Dkt. No. 47 at 3 (quoting 190 S.W.2d at 485). This case provides further evidence that there is no "well-established general rule" and that the issue remains largely unsettled.[12]

Given the complete lack of authority on this issue, and the conflicting positions in this case, the Court finds that the ultra-vires issue is unclear and unsettled. Based on the lack of clarity and the potentially decisive nature of this state claim, the Court finds that the second prong of *Pullman* is met on the ultra-vires issue.

### ii.   State law is not sufficiently unclear to justify abstention regarding whether state law preempts the ordinance.

The parties disagree about whether the ordinance is preempted by state law. The plaintiffs allege that the ordinance is irreconcilable with the state's penal code[13] and wrongful death statute in several ways and is therefore preempted. Thus, this case is unlike *Louisiana Debating and Literary Association v. City of New Orleans*, where the plaintiffs merely

---

[12] Although the Texas Solicitor General believes that plaintiffs' challenge to the city's ability to create a private cause of action will ultimately fail, he agrees that both sides have arguments on the point. Dkt. No. 47 at 3 ("At most, *Texas Driverless Co.* stands for the proposition that both sides in this case have respectable arguments to make about the scope of a city's authority to expand tort liability.").

[13] Because plaintiffs concede that their claims related to the ordinance's public-enforcement mechanism are not ripe, the Court only addresses whether *Pullman* would apply to plaintiffs' claims involving the private-enforcement mechanism.

raised state constitutional claims mirroring the federal constitutional rights claimed

abridged.  42 F.3d at 1492.

Another district court in Texas succinctly summarized the standard under Texas law

for evaluating the type of preemption claim asserted by the plaintiffs in this case.  Critically,

any statutory limit on local law "must appear with unmistakable clarity" for preemption to

apply:

> [T]he Texas Constitution circumscribes that power: no city ordinance "shall
> contain any provision inconsistent with the Constitution of the State, or of the
> general laws enacted by the Legislature of this State."  Tex. Const. art. XI, §
> 5(a); *see also Dall. Merch.'s & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d
> 489, 490–91 (Tex. 1993).  Thus, although home-rule cities in Texas enjoy broad
> self-governance authority, the State's constitution and laws place affirmative
> limits on that authority.  *BCCA*, 496 S.W.3d at 7.
>
> Texas may limit the authority of home-rule cities through "either an express
> limitation or one arising by implication."  *Lower Colo. River Auth. v. City of San
> Marcos*, 523 S.W. 2d 641, 645 (Tex. 1975).  However, regardless of whether a
> statutory limit on local laws is implicit or explicit, it "must appear with
> unmistakable clarity" to foreclose coregulation of a matter.  *City of Laredo v.
> Laredo Merchs. Ass'n*, 550 S.W.3d 586, 593 (Tex. 2018) (internal quotation
> marks omitted) (quoting *Lower Colo. River Auth.*, 523 S.W.2d at 645).
>
> Although home-rule cities can regulate broadly, when a municipal ordinance
> purports to regulate subject matter that is already regulated by a state statute, it
> is unenforceable "to the extent it conflicts with the state statute."  *Dall. Merch.'s*,
> 852 S.W.2d at 491 (citing *City of Brookside Vill. v. Comeau*, 633 S.W.2d 790, 796
> (Tex. 1982)).

*ESI/Emp. Sols., L.P. v. City of Dallas*, No. 4:19-CV-570-SDJ, 2021 WL 1227637, at *5 (E.D.

Tex. Mar. 31, 2021) (footnote omitted).  Therefore, "the critical inquiry in determining

whether [Lubbock's] ordinance is preempted is whether the [l]egislature expressed its

preemptive intent through clear and unmistakable language."  *BCCA*, 496 S.W.3d at 8.

Here, the Texas legislature expanded the wrongful death statute to include acts that

cause the death of a fetus, but it explicitly exempted from civil liability abortions performed

in compliance with state law.  Dkt. No. 13 at 27–28 (citing *T.L. v. Cook Children's Med. Ctr.*,

607 S.W.3d 9, 67 (Tex. App.—Fort Worth 2020, pet denied), *cert. denied*, No. 20-651, 2021

WL 78187 (U.S. Jan. 11, 2021); Tex. Civ. Prac. & Rem. Code §§ 71.002(a) (creating cause

of action for wrongful death of individual), 71.003(c) ("This subchapter does not apply to a

claim for the death of an individual who is an unborn child that is brought against: [mother,

abortion provider, dispenser of abortion drug, or physician or health care provider when

death results from lawful medical procedure.]")).  Similarly, Texas's health code permits

abortion by licensed physicians, subject to extensive requirements.  *See* Tex. Health & Safety

Code ch. 171.

Because the ordinance permits civil liability for abortion, while the wrongful death

statute precludes it, plaintiffs assert that the ordinance is preempted and void.  Dkt. No. 13

at 28.[14]  Texas Courts have yet to opine about whether the city's newly enacted ordinance is

preempted by state law.  Thus, unlike in *Caldera*, where the state Supreme Court was split

on the relevant preemption issue, it is not immediately apparent here that the state-law issue

is unsettled.

Contrary to plaintiffs' argument, the Texas legislature has issued multiple statutes

indicating that the ordinance is not preempted.  In 2019, the state legislature modified the

---

[14] Plaintiffs also allege that the ordinance conflicts with the state's wrongful death statute in more limited ways, such as by expanding the class of potential plaintiffs and eliminating the limitations period.  Dkt. No. 13 at 28.  These minor purported conflicts are more easily resolved because the ordinance contains a severability clause, and "[f]ederal courts are bound to apply state law severability provisions."  *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) ("Even when considering facial invalidation of a state statute, the court must preserve the valid scope of the provision to the greatest extent possible.").  *Id.*  Thus, these more minor distinctions identified by plaintiffs do not render the preemption issue unclear or unsettled.  However, those distinctions are only a minor piece of the alleged conflict between state and local law in this case.

Texas Government Code as follows "[t]his chapter may not be construed to restrict a municipality or county from prohibiting abortion."  Tex. Gov't Code § 2272.005.  This provides some indication that the state did not intend to preempt municipal action like the ordinance with "unmistakable clarity."[15]

Moreover, the state legislature's recent passing of the Texas Heartbeat Act appears to clear up and potentially resolve the issue of whether state law preempts the ordinance.  On May 19, 2021, Texas enacted the Texas Heartbeat Act, an act "relating to abortion, including abortions after detection of an unborn child's heartbeat" and "authorizing a private civil right of action."  Texas Heartbeat Act, 87th Leg., R.S., S.B. 8, § 2 (effective Sept. 1, 2021).  Among other things, the Act authorizes a private cause of action by "[a]ny person, other than an officer or employee of a state or local governmental entity in this state," against anyone who (1) "performs or induces an abortion in violation" of the bill; (2) knowingly aids or abets the performance or inducement of an abortion, or (3) "intends to engage in the conduct described by Subdivision (1) or (2)."  *Id.* § 3 (creating Tex. Health & Safety Code § 171.208(a)(1)–(3)).  Thus, like the city's ordinance, the Texas Heartbeat Act creates a private cause of action for violations, and it disclaims and bars any state enforcement.  *Id.* (creating Tex. Health & Safety Code § 171.207(a)) (mandating that "the requirements of this subchapter shall be enforced exclusively through [] private civil actions" and that "[n]o enforcement of this subchapter, and no enforcement of Chapters 19 and 22, Penal Code, in response to violations of this subchapter, may be taken or threatened by this state, a political subdivision, a district or county attorney, or an executive or administrative

---

[15] The Texas Solicitor General also claims that the city's "ordinance is entirely consistent with state law" even without consideration of the Texas Heartbeat Act.  Dkt. No. 47 at 4.

officer or employee of this state or a political subdivision against any person, except as provided [through private enforcement].").

Additionally, Section Five the Texas Heartbeat Act amends the state's Code Construction Act to clarify the permissible scope of coregulation by municipalities on the topic of abortion:

> Subchapter C, Chapter 311, Government Code, is amended by adding Section 311.036 to read as follows:
>
> Sec. 311.036. CONSTRUCTION OF ABORTION STATUTES. . . .
> (b) A statute may not be construed to restrict a political subdivision from regulating or prohibiting abortion in a manner that is at least as stringent as the laws of this state unless the statute explicitly states that political subdivisions are prohibited from regulating or prohibiting abortion in the manner described by the statute.

The Court recognizes that the Texas Heartbeat Act does not go into effect until September 1, 2021. However, there is no denying that the effectuation of this Act will weigh heavily against, if not moot, a claim that state law preempts the ordinance. And, in any event, the Act is relevant even before its effective date. Under Texas law, when a later-enacted statute clarifies the meaning of earlier statutes, it is "highly persuasive," even if it does not technically control. *Calvert v. Marathon Oil Co.*, 389 S.W.2d 153, 158 (Tex. App.—Austin 1965, writ ref'd n.r.e.); *see also Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 249 n.4 (Tex. 1991).

Moreover, and critical for this analysis, the Texas Heartbeat Act creates civil liability but does not amend or repeal the relevant portion of the wrongful death statute. Thus, it is clear that the legislature did not believe the two to be irreconcilable. Given that implication, and in light of this language protecting and preserving a city's right to regulate abortion, the Texas Heartbeat Act undermines the plaintiffs' preemption argument.

"In construing statutes [the Court's] primary objective is to give effect to the Legislature's intent." *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010).  In light of the Texas legislature's recent and unambiguous statements that cut heavily against any claim of preemption—let alone a claim of preemption with "unmistakable clarity"—the Court concludes that the issue is not sufficiently unclear to justify preemption.  Thus, assuming jurisdiction, the Court would not abstain on this ground.

### B.    The totality of the circumstances weighs in favor of abstention.

Because the Court finds that the prerequisites under *Pullman* are met for the ultra-vires claim, the Court must evaluate whether abstention is appropriate based on the rights at stake and the costs of delay pending state-court adjudication.  First, the Court notes that declining to abstain would disregard "the rightful independence of the state governments" and deprive Texas of the first opportunity to interpret its own laws.  The fact that municipality rights under state law are peculiarly matters of state and local concern makes this case an even stronger candidate for abstention.  *See Harris Cty. Comm'rs Court*, 420 U.S. at 83–84.

An aspect of this case that does not favor abstention is the fact that there is no pending state lawsuit on this issue.  The exercise of *Pullman* abstention would undoubtedly delay proceedings in this Court, and there is a "danger that valuable federal rights might be lost in the absence of expeditious adjudication."  *Id.* at 83.  Abstention is often "more appropriate when there is a direct route to obtaining an answer from the state's highest court rather than having to 'litigate[ ] through the entire state hierarchy of courts.'"  *Texas*

*Democratic Party*, 961 F.3d at 418 (quoting 17A C. Wright & A. Miller, *Federal Practice and Procedure* § 4242 (3d ed. 2020)).

However, multiple considerations indicate that any delay would not outweigh abstention principles. Voters passed the ordinance on May 1, 2021, and it became effective on June 1, 2021. Plaintiffs filed their Complaint on May 17, 2021, and the Court rendered this decision 15 days later. So there was no significant delay from the initial proceedings in this Court. Additionally, the Court notes that Texas courts are well qualified to expeditiously and thoroughly resolve the disputed state-law issues.

Most importantly, the Court finds that "the probability that any federal adjudication [in this case] would be effectively advisory is so great that this concern alone is sufficient to justify abstention," despite the fact that there are no pending state proceedings at this time. *Pennzoil Co.*, 481 U.S. at 11 n.9 (citing *Pullman*). This is because a constitutional pronouncement from this Court would have no binding effect in the state-court system. *See Arizonans for Official English*, 520 U.S. at 66 & n.21; *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (explaining that "Texas courts . . . are obligated to follow only higher Texas courts and the United States Supreme Court") (emphasis removed). Thus, Texas courts should have, and will have, the final word on the ultra-vires issue. Therefore, in light of its assessment of the totality of the circumstances, the Court concludes that abstention is appropriate on plaintiffs' ultra-vires claim.

### C.    Practical Requirement of Dismissal

For all these reasons, the Court finds that abstention is appropriate. Therefore, even if the Court had jurisdiction, the Court would dismiss the case without prejudice so that the

49

state courts could resolve whether Texas law prohibits cities from enacting private rights of action or whether state law preempts any component of the ordinance.

The Supreme Court of Texas has held that it cannot grant declaratory relief as long as a federal court maintains the case on its docket, *U.S. Life Ins. Co. v. Delaney*, 396 S.W.2d 855 (Tex. 1965).  Thus, in order to remove any possible obstacles to state-court jurisdiction, courts will dismiss cases "without prejudice so that any remaining federal claim may be raised in a federal forum after the Texas courts have been given the opportunity to address the state-law questions in [the] case."  *Harris Cty. Comm'rs Ct.*, 420 U.S. at 88–89; *see also Barrett v. Atlantic Richfield Co.*, 444 F.2d 38 (5th Cir. 1971).  However, because the Court finds that plaintiffs lack standing in this case, the Court need not actually dismiss on abstention grounds.

## 6.     Conclusion

Because plaintiffs fail to show, as they must, that they have Article III standing to sue the city, the Court dismisses the case for lack of jurisdiction.  Alternatively, assuming the Court is incorrect in that conclusion, it would abstain to allow the state courts to address plaintiffs' claim that the city lacked authority to create civil liability between private litigants.  To effect abstention, the Court would dismiss the case without prejudice so any remaining federal claim could be raised, if necessary, after resolution of the state-law issue.

So ordered on June 1, 2021.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE